P.R. BURKE CORP., Plaintiff–
Appellant,

v.

UNITED STATES, Defendant–Appellee.

No. 01–5001.

United States Court of Appeals,
Federal Circuit.

Jan. 23, 2002.

Sean Brew, The Corona Firm, LLP, of San Diego, California, argued for plaintiff-appellant. With him on the brief was Richard D. Corona.

Gerald M. Alexander, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; and Bryant G. Snee, Assistant Director.

Before MICHEL, CLEVENGER, and GAJARSA, Circuit Judges.

MICHEL, Circuit Judge.

Plaintiff–Appellant P.R. Burke Corp. ("Burke") appeals from a decision granting the government partial summary judgment and holding the government not liable for any delay damages arising from Burke's contract to repair and improve a sewage treatment plant. *See P.R. Burke v. United States*, 47 Fed. Cl. 340 (2000). As more

fully discussed below, the United States Court of Federal Claims rejected Burke's argument that the contract language requiring the plant to "remain in operation" during contract performance nevertheless allowed Burke to shut down the plant's "trickling filter." In addition, the court found that Burke was responsible for the delay for which it seeks damages. *See id.* at 353.

We agree with both conclusions of the trial court. We also agree with the trial court's holdings that Burke's contract interpretation was unreasonable and any ambiguity among different contract provisions was patent. Further, we hold that even assuming the government alone did cause any of the delays between the time when Burke received the contract and the time when it actually began to perform, that delay was necessary, in due exercise of a contract right, not excessively long under the circumstances and thus reasonable. For this reason, too, the government is not liable for delay damages. We therefore affirm.

## BACKGROUND

### I. *Contract Language*

The contract at issue, No. 2175, was awarded to Burke on September 27, 1994, and involved the repair and improvement of Sewage Treatment Plant Two ("STP 2") at the United States Marine Corps Base at Camp Pendleton, California. Among other things, Burke's contract required that it demolish some of the existing plant structures and install new ones and that it complete all of its contractual responsibilities by October 7, 1995. The project description also set forth the following requirements:

> [T]he furnishing of all labor, approved materials, and equipment required for the demolition of the existing chlorine contact tank, trickling filter, imhoff tank, and mechanical requirement within the existing primary sludge pump station; sludge bed rehabilitation work; new aerated grit chamber and grit washer/hopper; new sludge pumps in the existing sludge pump station; two new trickling filters (using existing cleaned rock media) with flow splitter box and pump station; new secondary sludge pump station; new secondary clarifier; new chlorine contact tank; new solids contact basin and appurtenances; new sludge bed recycle pumps in existing wet well; new operations/laboratory building; and all the necessary appurtenances to make the facilities fully operational.

(§ 01010, Part I, § 1.1.1, Project Description).

Burke was further required to adhere to the scheduling requirements stated in section 1.5 of section 01010 of the contract:

> b. *The plant shall remain in operation during the entire construction period* and the Contractor shall conduct his operations so as to cause the least possible interference with the normal operations of the activity.

> c. The contractor shall be responsible for pumping out basins and pipelines of sewage or sludge so as to perform the work. This shall also include temporary pumping to *maintain operation of the facility.*

(J.A. at 10) (emphasis added). The Index of Drawings included in the contract similarly specified that the *"PLANT SHALL REMAIN OPERATIONAL AT ALL TIMES. CONTRACTOR TO SUBMIT CONSTRUCTION SCHEDULING AND BYPASS PLANS FOR CONTRACTING OFFICER'S APPROVAL."* (J.A. at 26) (emphasis added). The parties do not dispute that, under these contract provisions, the government had the right to approve the schedule submitted by Burke.

Meanwhile, Drawing C–1 to the contract depicted the areas of the plant that Burke

had to repair, showing both the existing location of various structures and the planned location of the structures that Burke had to construct. In particular, this drawing illustrated the location of the two new trickling filters. A trickling filter provides secondary treatment of waste in sewage treatment, *i.e.*, it converts organic materials into carbon dioxide, water and inert materials called "sludge."

In the contract drawings, one of the new trickling filters appeared in the same area as the existing trickling filter. Portions of the trickling filter pump station and chlorine contact tank that Burke was required to construct likewise appeared in the same location as the existing trickling filter.

## II. *Events Leading to Dispute*

Before commencing work, Burke was required to prepare a demolition and construction plan, submit the plan to the government and obtain the government's approval, *i.e.*, the government was to review the demolition plan to ensure that it conformed to the contract's requirements. On October 6, 1994, Burke informed the government that its draft demolition plan entailed (among other things) demolishing the trickling filter at the beginning of construction to make way for the new structures that were to be built in its place. The government, however, indicated that this would cause "operational" problems.

To resolve this issue and clarify the sequence of demolition and construction, the parties met, at Burke's request, on October 24, 1994. At the meeting, Burke sought clarification from the government regarding the work sequence. In a follow-up phone call from the Officer–in–Charge of Construction to Burke on October 26, 1994, the government agreed to provide Burke with written guidance about the work sequence.

But, before receiving any such writing, Burke submitted its demolition and construction plan to the government on October 28, 1994. The plan required the shutdown of the existing trickling filter for the duration of the contract work. According to Patrick R. Burke, the president and owner of the company, Burke realized that its plan essentially called for the effective shutdown of the plant; Burke simply expected that the government would reject its plan and, at the same time, would respond with written directions that described a project schedule consistent with the contract specifications. The government received this plan on October 31, 1994.

The government rejected Burke's submitted schedule in a letter dated November 10, 1994. In the government's view, the plan to demolish the existing filter structure before constructing a new trickling filter would fail to maintain the plant's continuous operation as required by the contract. The letter also included a suggested sequence of tasks and a request that Burke submit a new sequence of work. The government's suggested sequence recommended that Burke could do the following:

(a) Before removal of the Imhoff tanks, divert and maintain sewage flow to existing trickling filter.

(b) Construct northern trickling filter (over existing Imhoff tank), place on line, and allow sufficient time for the media culture to become established, before demolition of existing trickling filter.

(c) Construct secondary clarifier and chlorine contact tank and install new piping before demolition of existing piping systems.

In other words, the government suggested that Burke first construct the "northern trickling filter" and make it operational before Burke went ahead and demolished the existing trickling filter, which Burke

would then replace with the new "southern trickling filter." Burke received this suggested sequence on November 16, 1994.

Sometime between November 16 and December 5, Burke requested another meeting to discuss the suggested sequence, saying it needed additional direction. The parties met on December 5, 1994, and by letter dated December 22, 1994, the government reiterated its suggested sequence of work and "directed" Burke to submit yet another demolition and construction plan, one that conformed to the government's suggested sequence. Burke received this letter on December 27, 1994.

Burke timely submitted a new demolition plan on December 29, 1994, but noted its assumption that the government would issue a change order relocating the new trickling filter pump station to a location outside the existing trickling filter area. See Burke Decl. ¶ 15. Burke also asserted that adapting its plans to conform to the government's suggested sequence would cost Burke approximately $400,000 and would extend the estimated completion date approximately nine months, to July 6, 1996.

On January 11, 1995, the government issued Modification 1, under the Changes Clause, FAR § 52.243–4, and thereby ordered Burke to rebuild the trickling filter pump station away from the existing trickling filter. The modification, however, did not change the contract price or completion date. Burke began work the following day. On January 19, 1995, the government approved Burke's demolition and construction plan but rejected Burke's adjusted performance schedule.

Burke timely completed its work on the sewage plant but now maintains that, in order to timely perform, it was forced to operate on an accelerated schedule. Seeking "delay damages" in the amount of $890,085, the cost of this alleged accelera-tion and other attendant expenses, Burke sued the government in the Court of Federal Claims. In so doing, Burke alleged that it had incurred these additional costs because of the government's unreasonable rejection of its original planned sequence of work and refusal to grant an extension of time. The government moved for summary judgment on this claim, contending that its rejection of Burke's proposed work sequence was proper under the contract.

### III. Court of Federal Claims' Contract Interpretation

The trial court concluded that Burke's interpretation of the contract language was both incorrect and unreasonable and that, even if Burke's interpretation were reasonable, Burke still could not prevail because it had a duty to inquire about a patent ambiguity in the contract language. Specifically, the court held, Burke had a duty before bidding to clarify the meaning of the contractual requirement that the plant "remain in operation" throughout the construction period, since Burke's own interpretation of other parts of the agreement plainly conflicted with this term. See Burke, 47 Fed. Cl. at 352–53.

In denying Burke's claim for delay damages, the court determined that Burke's contract interpretation was unreasonable because it would have shut down the trickling filter—an integral component of the wastewater treatment process—for the duration of contract performance. See id. And shutting down the trickling filter, the court reasoned, meant the plant would not have "remain[ed] in operation." The court based this analysis on the plain meaning of the word "operation," which it defined as "a process or series of acts aimed at producing a desired result or effect." Id. (citing Webster's II New Riverside University Dictionary 824 (1988)). Under the court's analysis, the "operation" here in-

volved sewage treatment and that operation would not work absent the trickling filter; thus, any interpretation of the contract that failed to produce this result would necessarily be unreasonable. *Id.* As the court explained:

> [T]he treatment process at STP2 [the plant] consists of four interconnected treatment states: (1) preliminary treatment, removing large debris and gross solids through the use of screens and grit chambers; (2) primary treatment, allowing solids to settle and be removed; (3) secondary treatment, converting indissoluble solids into carbon dioxide, water, and "sludge" through bio-remediation; and (4) advanced treatment, disinfecting microorganisms that passed the other treatment states by introducing chemical elements to the treated water.

*Id.* at 348 n. 8. The trickling filter, as noted earlier, performs the function of secondary treatment (step three above). Because Burke's proposed shutdown of the trickling filter would have removed a critical step from the operation or series of acts needed to treat wastewater, Burke's plan thereby conflicted with the requirement to maintain the plant's operation throughout the project. The court therefore held that Burke's plan did not comply with the contract.

■ The trial court further held that even if Burke did reasonably interpret the contract, Burke still could not prevail. This was so, the court explained, because any ambiguity was patent, and contractors will have such an ambiguity construed against them unless they inquired about the correct meaning of the terms at issue. *See id.* at 351 (citing *Interstate Gen. Gov't Contractors, Inc. v. Stone*, 980 F.2d 1433, 1436 (Fed.Cir.1992)). Burke, however,

failed to clarify the ambiguity before submitting its bid, leading the court to find it "responsible for the delay that ensued." *Id.* at 355.

Accordingly, the Court of Federal Claims rejected Burke's arguments, granted the government's motion for partial summary judgment and entered partial judgment on that claim.[1] *See* RCFC 54(b). Burke timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

Burke contends it was wrongfully denied a trial because genuine issues of material fact exist about contract interpretation and about the cause and liability for the delay in the submission and approval of its demolition plan, as well as for the issuance of instructions on work sequencing. We, too, reject Burke's arguments and agree with the trial court's well-reasoned and thorough opinion.

I. *Contract Interpretation*

A. Plain Meaning of "Remain in Operation"

■ According to Burke, the trial court incorrectly held that the disputed contract language could be interpreted as a matter of law. Specifically, Burke alleges the contract term "the plant shall remain in operation" is ambiguous because, Burke argues, it was impossible to perform the various contract demolition and construction tasks so that the plant remained in operation. In P.R. Burke's view, "it would be necessary to demolish both the imhoff tank and the existing trickling filter in order to allow the construction of the new trickling filters ... [because Contract Drawing C 1 shows that] [a]pproximately

---

1. Burke's complaint alleged ten causes of action; this appeal concerns only one, leaving the remaining nine unadjudicated. The parties concede that several other counts of the complaint may be affected by this decision.

60% of the new structures are to be placed in the location of the existing trickling filter and imhoff tank, including the new trickling filters, trickling filter pump station and splitter box." Burke Decl. ¶ 7. Additionally, Burke asserts that the contract provision about having the "crushed stone/slag from the existing STP–2 trickling filter ... utilized to the greatest extent possible" meant that "it would be necessary to take the existing trickling filter off-line and remove the rock material contained therein for use in the new trickling filters." *Id.* at ¶ 9.

Burke intended to "bypass the trickling filter and imhoff tank during construction," (Burke Decl. ¶ 10), asserting that "[t]here is no information in the contract documents indicating that either of these existing plant structures must be kept operational during construction, (*id.* at ¶ 7)." In Burke's view of the contract, it could send the wastewater through the treatment plant without secondary treatment, *i.e.*, by-passing the trickling filter. Burke, however, provided no affidavit or other evidence showing that the water could bypass the secondary treatment phase and still be adequately disinfected and decontaminated.[2]

The trial court found that this interpretation of the contract was incorrect, and we agree. Significantly, the trial court identified several alternatives for sequencing the tasks needed to perform the contract, each of which would have permitted the plant to "remain in operation." Further, as the trial court noted, the contract provision relating to reuse of trickling filter material merely states "to the greatest extent possible." As such, we agree that "this phrase injects flexibility into the provision, affording Burke the ability to harmonize this provision with paragraph 1.5's requirement that STP 2 [the plant] remain

in operation." *Burke*, 47 Fed. Cl. at 349. Accordingly, we accept the trial court's interpretation of the contract term "the plant shall remain in operation" and hold as a matter of law that the plain language of this term meant the plant had to remain functional and thus had to continue its normal treatment of wastewater. Without the trickling filter, secondary treatment of the wastewater would not be possible; and secondary treatment, as the evidence showed, is essential. *See* Strickler Decl. ¶¶ 4–5 (Aug. 5, 1997) (stating that "remov[ing] the secondary and disinfection processes from the operation of STP2 [would result in] little to no reduction of the raw wastewater contaminants ... be[ing] achieved, effectively rendering the plant non-operational."). It follows then that if the trickling filter was taken off-line, the plant could no longer perform that function. Therefore, it could not "remain in operation."

■ Burke counters by pointing to a declaration of P.R. Burke averring that, at the meeting held with the government on October 24, 1994, the assistant plant manager orally stated that the trickling filter could be shut down, but only for "not more than 60 days." This statement, argues Burke, creates a genuine issue of material fact about the meaning of the term "shall remain in operation," because it suggests that the plant could indeed operate without the filter, albeit for a short time only.

We disagree. First, we note that, seen in a light most favorable to Burke, this statement still does nothing to support the assertion that Burke could keep the trickling filter off-line for an entire year (as Burke proposed) and still comply with the contract; even under Burke's evidence, it would run afoul of the "remain in operation" term once the putative "60–day" period had run.

---

**2.** In other words, Burke offered no evidence showing that, without the secondary treatment process, the plant could still treat wastewater and thus still "remain in operation."

More important, the assistant plant manager allegedly made this statement, not the contracting officer responsible for the agreement's execution. Our precedent instructs that absent some unique circumstances not present here, *e.g.,* fraud, only the government's contracting officer or other authorized representatives can bind the government. *See, e.g., Wilber Nat'l Bank v. United States,* 294 U.S. 120, 123–24, 55 S.Ct. 362, 79 L.Ed. 798 (1935); *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997); *City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990); *Max Drill, Inc. v. United States,* 192 Ct.Cl. 608, 427 F.2d 1233, 1243 (Ct.Cl.1970) ("It has long been held that a subordinate Government [sic] employee cannot render contract interpretation binding on the parties."); *see also* FAR 2.101. And Burke has done nothing to show that the government or the contracting officer himself had somehow clothed this assistant plant manager with the authority to speak on their behalf. At any rate, we also find that this stray statement from the terse minutes of the meeting on October 24 amounts to nothing more than a scintilla of evidence and that it cannot withstand summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Burke failed to provide any other evidence showing that the sewage treatment plant could continue to operate without the trickling filter. The government, by contrast, offered conclusive evidence confirming that the plant, indeed, could not operate normally without that filter. *See* Strickler Decl. ¶¶ 4–5 (Aug. 5, 1997) (stating that the trickling filter is necessary for secondary treatment of the wastewater). We agree, in other words, that Burke failed to establish a genuine issue of material fact concerning the interpretation of "remain in operation."

**B. Burke's Duty to Inquire about an Ambiguous or Conflicting Term**

Even if we assumed that the term "remain in operation" was ambiguous, the ambiguity was (as the trial court found) patent and therefore had to be construed against Burke. Courts, of course, ordinarily construe an ambiguous contract term against the party who drafted it. *Interstate Gen. Gov't Contractors,* 980 F.2d at 1434. But our precedent makes clear that, as an exception to this rule, an ambiguity on the face of the contract-a "patent" ambiguity-triggers a duty on behalf of a public contractor to inquire about that ambiguity before it even bids on a contract. *Id.* at 1434–35 (citing *Newsom v. United States,* 230 Ct.Cl. 301, 676 F.2d 647, 649 (Ct.Cl.1982)). "Absent such an inquiry, a patent ambiguity in the contract will be resolved against the contractor." *Triax Pac., Inc. v. West,* 130 F.3d 1469, 1475 (Fed.Cir.1997) (citing *Beacon Const. Co. v. United States,* 161 Ct.Cl. 1, 314 F.2d 501, 504 (Ct.Cl.1963)).

Applying these principles, we find that we must indeed construe any contract ambiguity against Burke and, further, that Burke's interpretation of the term at issue cannot create a genuine issue of material fact. Simply put, Burke's proposed construction of the contract would shut down critical operations of the plant and would have completely disrupted normal plant operations, in direct conflict with the "remain in operation" and least possible disruption terms. This conflicting interpretation thus appears on the face of the contract, meaning any public contractor would have had a duty to ask for clarification before bidding. Despite this patent ambiguity, Burke did not seek clarification.

Further, even if we found the ambiguity to be latent, Burke's claim

would still fail. This is so because "[a] contractor's interpretation of a latent ambiguity will only be adopted if it is found to be reasonable." *Cmty. Heating & Plumbing v. Kelso*, 987 F.2d 1575, 1579 (Fed.Cir. 1993) (citing *Froeschle Sons, Inc. v. United States*, 891 F.2d 270, 270 (Fed.Cir.1989)).[3] "If the court finds that a patent ambiguity did not exist, then the reasonableness of the contractor's interpretation becomes crucial in deciding whether the normal contra proferentem rule applies." *Newsom v. United States*, 676 F.2d 647, 649–50 (Ct.Cl.1982) (further explaining that "[t]he court may not consider the reasonableness of the contractor's interpretation, if at all, until it has determined that a patent ambiguity did not exist.").

The trial court found Burke's interpretation of "remain in operation" to be unreasonable. *See Burke*, 47 Fed. Cl. at 347. We agree. Again, the contract language required Burke to perform in a manner that kept STP 2 in operation during the construction period. Because Burke's contract interpretation would have shut down STP 2's existing trickling filter, thereby removing a critical step from the series of acts necessary to treat wastewater and putting that interpretation in direct conflict with the contract language, we find Burke's interpretation of "remain in operation" unreasonable. Therefore, even if we were to find the ambiguity latent, Burke could not prevail.

Accordingly, we hold that Burke has failed to establish a genuine dispute about the meaning of "remain in operation."

### C. The Government's Reply Brief

■ Burke's final argument regarding contract interpretation is that the trial court improperly relied on facts that the government first submitted in its Reply Brief, not in its "Separate Statement of Material Facts." We see no merit with this argument. The government's Reply Brief simply responded to factual contentions made in Burke's Opposition; namely, that it was not possible to construct the northern trickling filter and place it on-line without first demolishing the existing trickling filter. The government was simply refuting Burke's contention by giving several demolition and construction alternatives. In order to support this factual argument and indeed to comply with the procedures governing summary judgment, *see* RCFC Appendix H (mandating that the court will disregard any factual assertion "unless supported by ... a witness' affidavit or a declaration"), the government included a declaration from its consultant that fully described the facts at issue. It is clear that the government offered this factual argument and supporting declaration only to rebut Burke's own factual assertions in its Opposition. Accordingly, the evidence was properly before the trial court. In any event, its admission for summary judgment purposes does not constitute an abuse of discretion. Therefore, we also affirm its decision to admit and rely on this declaration.

### II. *Responsibility for Delay*

■ Aside from its contention about the meaning of "remain in operation," Burke also contends the government was obligated to grant a time extension and associated costs under either the "Changes" Clause of the contract or, alternatively, under the "Suspension of Work" Clause. Under either clause, argues Burke, it incurred delay damages for the period from at least October 24, 1994, to December 27, 1994, during which the gov-

---

**3.** In order for a contractor to recover based on an ambiguous contract provision, the contractor must have relied on its interpretation of that provision when preparing its bid. *See Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed.Cir.1986).

ernment kept requesting contract-compliant demolition plans.[4] Attempting to create a genuine dispute about the cause of the delay, Burke urges, as it did below, that the contract is a design contract. *See Burke*, 47 Fed. Cl. at 350. And because the government poorly designed the project, argues Burke, it was impossible to perform as specified without rendering the plant non-operational. Therefore, Burke concludes, it was the government's responsibility to redesign the contract such that it was performable and to grant Burke additional time and money. Burke, in addition, argues that the government's suggestions about the demolition and construction sequence were actually binding changes to the contract's design specifications and that Burke therefore had no choice but to follow them. Consequently, the argument goes, the government should be liable for the delay incurred while the project was re-designed.

## A. Performance Versus Design Contracts

■ These arguments are unpersuasive. In our precedent, the distinction between performance and design specifications is well established:

Performance specifications 'set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, *selecting the means and assuming a corresponding responsibility* for that selection.' ... Design specifications, on the other hand, describe in precise detail the materials to be employed and *the manner in which the work is to be performed.* The contractor has no discre-

tion to deviate from the specifications, but is 'required to follow them as a road map.'

*Blake Const. Co. v. United States*, 987 F.2d 743, 745 (Fed.Cir.1993) (quoting *J.L. Simmons Co. v. United States*, 188 Ct.Cl. 684, 689, 412 F.2d 1360 (1969)) (emphasis added). Here, we hold that the parties formed a performance contract. Indeed, in its complaint, Burke itself all but concedes that this is a performance contract, stating that "[a]ccording to the terms of the Contract, the *contractor is entitled to plan and schedule the manpower, materials and methods of construction* necessary to complete the Project as specified." Complaint at ¶ 9 (emphasis added).

Moreover, the project description in the contract states, "[t]he work includes the *furnishing of all labor, approved materials, and equipment required for* [the project] ... and all the necessary appurtenances to make the facilities fully operational." (§ 01010, Part I, § 1.1.1, Project Description). And other aspects of the project description require "the demolition of the existing chlorine contact tank, trickling filter, imhoff tank, ... two new trickling filters (using existing cleaned rock media) with flow splitter box and pump station; new secondary sludge pump station...." In short, nothing in the contract's description dictates the *"manner"* in which Burke must perform, *see Blake Construction Co.*, 987 F.2d at 745; it merely identifies *what* Burke must have completed by the end of performance. No sequence of demolition and construction tasks is specified.

Further, the contract shows that the contractor—not the government—had to

---

4. We note that Burke's brief gives inconsistent dates about the period for which it seeks delay damages, saying on the one hand that the relevant period began on October 6, 1994 (*see* Appellant's Br. at 16, 29), and, on the other, that it also began on October 24, 1994 (*see* Appellant's Br. at 29). We need not guess which date Burke is actually claiming, however, given our conclusion that Burke could not, in any event, withstand summary judgment.

design the trickling filter. The trickling filter section of the contract does contain the heading "Design Requirements," which in turn describes the requirements: "design filter for a flow range from a minimum 1980 gallons per minute (gpm) to maximum of 3450 gpm and average design loading of 2620 gpm of sewage having a maximum 24–hour biochemical oxygen demand (BOD) of 195 milligrams per liter (mg/L)." Again, however, this simply shows that the government was telling Burke how the trickling filter needed to perform after Burke had completed it, not how Burke itself should go about constructing the filter. Indeed, under the contract, Burke had to submit drawings that "show the complete assembly of equipment, components, and parts" for the trickling filter. Accordingly, all the contract did was "set forth an objective or standard to be achieved," the definition of a performance contract. *See J.L. Simmons Co.*, 188 Ct.Cl. at 689, 412 F.2d 1360. As a performance contract, the time needed to develop work plans that comply with contract terms is chargeable to the contractor, especially when, as here, the contract expressly requires submission of design plans and work schedules for approval. Therefore, because it was Burke's responsibility to determine how to perform the demolition and construction and because the contract was in fact performable as written, Burke did not require a change order to be able to perform its obligations under the contract.

**B.** **The Government's Actions Did Not Change Burke's Responsibilities**

██ Nor can Burke successfully argue that the government's subsequent actions converted their agreement from a performance contract to a design contract, for none of these asserted actions indicates that Burke had to abide by the government's suggested sequence. *See id.* The government's minutes of the October 24 meeting, as well as Burke's memorialization of a follow-up phone call between Mr. Burke and a government representative, do indicate that the government would provide a change order regarding sequencing.[5] But while the parties discussed the issuance of a change order, the government never actually *did* anything to prevent Burke from immediately proceeding as Burke saw fit, *i.e.*, from submitting its own contract-compliant demolition and construction plan. Nor did an actual "change order" as proposed at the October 24 meeting actually issue.

In addition, after Burke informed the government of its draft demolition plan and then submitted a plan (neither of which conformed with the express language of the contract), the government sent a suggested demolition and construction sequence to Burke. The government's responsive letter stated, "*[t]o facilitate your effort*, the following parameters are provided so that interruptions to the facility operations can be held to a minimum as required." (J.A. at 49) (emphasis added). Nothing in this language suggests Burke "had no discretion to deviate from the [suggested] specifications." *See Blake Construction Co.*, 987 F.2d at 745. Accordingly, the government's November 10 letter did not transform the contract into a design contract, either. Thus, contractor rights under the Changes clause were not invoked.

---

**5.** The minutes merely recite "Change Orders needed Officially: Paul Heiss and Pat Burke both said that change orders need to be officially issued on the following: sequencing. . . ." The memorialization of the phone call included that "[t]he Navy agrees that Burke Corporation needs written instruction on the logistics and sequencing. . . . Burke Corporation requests you acknowledgement [sic] of extension of time and change orders in writing."

Because the contract remained a performance contract, it was Burke's responsibility to "select[ ] the means [of performance] and assum[e] a corresponding responsibility for that selection." *J.L. Simmons Co.,* 188 Ct.Cl. at 689, 412 F.2d 1360. It logically follows that Burke is liable for any delay incurred by its formulation of a contract-compliant plan for demolition and construction. Therefore, we hold that any delay during which Burke was formulating a contract-compliant demolition and construction plan is attributable to Burke. Accordingly, the delays from October 24 through October 31, 1994, and November 10 through December 27, 1994, are chargeable solely to Burke.[6]

 Alternatively, Burke maintains that it was under "constructive suspension" as of the October 24 meeting. Constructive suspension occurs when work is stopped absent an express order by the contracting officer and the government is found to be responsible for the work stoppage. *See* Cibinic & Nash, *Administration of Government Contracts* 589–90 (3d ed.1995). Burke's contention is that the government's acknowledgment that a change order should issue constructively suspended Burke from performing under the contract until a change order issued and, therefore, any delay incurred as a result is chargeable to the government. First, as stated above, the government was not obligated under the contract to issue a change order, as it had apparently agreed to do, because the contract was performable as written. Second, nothing the government did or said prevented Burke from submitting a contract-compliant plan at

any time. Finally, as Burke concedes in its brief, any government delay must be unreasonable in order to rise to the level of a constructive suspension. *See* Appellant's Br. at 27 (citing *John A. Johnson & Sons, Inc. v. United States,* 180 Ct.Cl. 969, 984–85 (1967)).[7] As discussed in detail below, any delay attributable to the government following the October 24 meeting was reasonable. For all these reasons, Burke could not have been under constructive suspension.

### C. Burke's Failure to Submit a Conforming Demolition Plan

 The remaining time period for which Burke seeks damages is between October 31 and November 10, 1994. During this period, Burke was awaiting the government's response to its plan. The general rule is that

> "[w]here both parties contribute to the delay neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and expense attributable to each party." *Blinderman Construction Co. v. United States,* 695 F.2d 552, 559 (Fed.Cir.1982), quoting *Coath & Goss v. United States,* 101 Ct. Cl. 702, 714–15 (1944). Courts will deny recovery where the delays are *concurrent* and the contractor has not established its delay apart from that attributable to the government.

*William F. Klingensmith, Inc. v. United States,* 731 F.2d 805, 809 (Fed.Cir.1984) (emphasis added). In this case, therefore, Burke may only recover if it can (1) estab-

---

**6.** While Burke "submitted" its plan on October 28, October 31 was the day the government first received Burke's plan. Accordingly, the government is not responsible for the time it took the mail to arrive. Similarly, the government responded to the submitted plan on November 10 and is not charged the time it took Burke to receive the letter.

**7.** Further, delays preceding the issuance of a change order, or in this case a modification, fall under the Suspension clause as opposed to the Changes clause, and the government is permitted a reasonable period of time to decide whether to issue a change. *See* Cibinic & Nash at 600–01.

lish that the government alone delayed the work by failing to issue a timely and *necessary* change order; and (2) prove which portion of the total period of delay was thus chargeable solely to the government. *See id.*

Here, it is undisputed that despite the October 24 discussion, Burke was contractually required to prepare a demolition plan, submit it to the government and obtain the government's approval. Under the contract, moreover, the government had a right to review this demolition plan and ensure that it conformed to the contract requirements. *See Cascade Pac. Int'l v. United States,* 773 F.2d 287, 291 (Fed.Cir.1985) (illustrating that the government has a right to insist upon compliance with the contract's requirements). The government had no contract obligation to issue change orders, modifications, or suggestions on sequencing or do anything else before October 31.

On October 31, the government received Burke's first demolition plan. When it submitted this plan, however, Burke was "aware that the government would almost certainly reject the request." *See* Burke Decl. ¶ 12. Ten days after receipt, as expected, the government returned the demolition plan to Burke for correction, because the plan included taking the trickling filter off-line for the duration of the contract, a sequence that conflicted with the "remain in operation" term.

As a matter of law, then, this ten-day period cannot be attributable solely to the government because it was caused by Burke's failure to comply with the contract. The government, for its part, was merely exercising its right under the contract to receive, review, and approve a plan that conformed to the contract. *See Cascade Pacific Int'l,* 773 F.2d at 291 (stating that the government, like any other party, is entitled to receive what it contracted for). Moreover, Burke's submission of a demolition plan that it fully expected the government to reject hardly seems in keeping with the obligation to perform in "good faith." *See Restatement (Second) of Contracts* § 205 (1979) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."). Accordingly, Burke also cannot recover damages for the ten-day period between October 31 and November 10, 1994.

### D. The Government Acted Reasonably

[19, 20] Last, even assuming we found the government solely responsible for some portion of the two-to-three month delay, we also would find that throughout this entire period the government acted reasonably and it therefore could not incur liability for delay damages. In addition to the requirements described above, contractors can recover delay damages against the government only if there is government-caused delay and it was unnecessary or unreasonable in duration. *See PCL Const. Servs., Inc. v. United States,* 47 Fed. Cl. 745, 801 (2000) (stating " 'the court [will] award delay damages only for the unreasonable portion of a government-caused delay' ") (quoting *Mega Const. Co., Inc. v. United States,* 29 Fed. Cl. 396, 425 (1993)); *see generally* Cibinic & Nash at 603. "The limitation of recovery to unreasonable delays is accomplished by determining whether the delay is the result of Government [sic] fault or was incurred pursuant to a contractual right of the Government [sic]." *Id.* "What is a reasonable period of time for the [G]overnment [sic] to do a particular act under the contract is entirely dependent upon the circumstances of the particular case." *Tri–Cor, Inc. v. United States,* 198 Ct.Cl. 187, 458 F.2d 112, 131 (Ct.Cl.1972) (citing *Specialty Assembling & Packing Co. v. United States,* 174 Ct.Cl. 153, 355 F.2d 554, 565 (Ct.Cl. 1966)).

Here, the contract required that Burke submit a demolition plan that complied with contract requirements. It did not do so until December 29, 1994. During the delay, the government twice provided Burke in writing with a suggested sequence that Burke could adopt and that the government would approve. And yet, Burke chose not to do so until December 29, 1994, more than a full month after the government had first suggested it. Further, we can hardly disadvantage the government for performing some of the planning duties for which Burke itself was responsible.

In any event, any delay caused solely by the government was incurred under a contractual right of the government—its right to receive, review and approve a conforming demolition plan before Burke began to perform. *See J.L. Malone & Assocs., Inc. v. United States*, 879 F.2d 841, 845 (Fed. Cir.1989) (stating "it is settled that the government is entitled to obtain precisely what it contracts for as long as it does not mislead the contractor") (citing *Am. Elec. Contracting Corp. v. United States*, 217 Ct.Cl. 338, 579 F.2d 602, 608 (Ct.Cl.1978)). The ten days it took, moreover, were not excessive. For all these reasons, any delay caused solely by the government cannot be found unreasonable.

## CONCLUSION

Because (1) Burke failed to establish a genuine issue of material fact as to either contract interpretation or the liability for delay; (2) the government established Burke was solely or at least concurrently responsible for all the delays that Burke complains of; and (3) even assuming a period for which the government alone was responsible, that delay was reasonable and necessary to assure contract compliance, the Court of Federal Claims' grant of partial summary judgment is

*AFFIRMED.*