ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Granite Construction Company | )     ASBCA No.  62281 |
| | ) |
| Under Contract No.  W9126G-15-C-0037 | ) |

APPEARANCES FOR THE APPELLANT:     Michael A. Branca, Esq.
                                    Joshua Morehouse, Esq.
                                      Peckar & Abramson, P.C.
                                      Washington, DC

APPEARANCES FOR THE GOVERNMENT:     Michael P. Goodman, Esq.
                                      Engineer Chief Trial Attorney
                                    Clark Bartee, Esq.
                                      Engineer Trial Attorney
                                      U.S. Army Engineer District, Galveston


OPINION BY ADMINISTRATIVE JUDGE CLARKE
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Although we have before us cross-motions for summary judgment, because there are disputed material facts, we ultimately grant only partial summary judgment.  This case involves the proper interpretation of the Federal Acquisition Regulation (FAR) 52.249-10, DEFAULT (APR 1984), and FAR 52.242-14, SUSPENSION OF WORK (APR 1984) and whether the monthly anticipated adverse weather delay in Specification SECTION 01 10 00.00 45, 1.4 TIME EXTENSIONS FOR UNUSUALLY SEVERE WEATHER may be subtracted from a suspension period.  We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109.  We find that the adverse weather delay may not be subtracted from a suspension period and grant partial summary judgment to Granite.

STATEMENT OF FACTS (SOF) FOR THE PURPOSES OF THE MOTION

For purposes of resolving the pending cross-motions for summary judgment, the parties entered into a joint stipulation of twenty-five numbered paragraphs which is incorporated below.

1. On August 31, 2015, Granite Construction Company (Granite) was awarded Contract No. W9126G-15-C-0037 by the United States Army Corps of Engineers (COE) to perform the construction of new outlet structures and cutoff walls at the Addicks and

Barker dams as a portion of the Buffalo Bayou and Tributaries federal flood control project in Houston, Texas (R4, tab 1).

2. On September 29, 2015, the COE issued and Granite acknowledged a Notice to Proceed to Granite that established a required completion date of the contract of May 31, 2019.

3. At all times relevant to this action, the COE exercised exclusive control over the operation of Addicks and Barker dams.

4. Under Section 01 00 10, part 1.4 of the contract, under normal conditions the combined release of water from the Addicks and Barker dams was to be limited to 2,000 cubic feet per second (CFS) as measured downstream at the Piney Point gauging station (R4, tab 1 at 2628-29).

5. Section 00 31 33, paragraph 2.3 of the contract similarly provides that the combined releases cannot exceed 2,000 CFS under normal operating conditions and that the maximum discharge from one reservoir of 2,000 CFS requires the other to be closed.

6. On August 25, 2017, Hurricane Harvey made landfall on the coast of Texas. In the following days, Hurricane Harvey brought rain as well as flooding to the Houston, Texas, Metropolitan Area, which includes the contract project site at the Addicks and Barker Dams.

7. After the landfall of Hurricane Harvey, on or before August 28, 2017, the COE began releasing water from the Addicks and Barker dams, with the combined flow rate increasing to over 4,000 CFS.

8. The COE continued to increase the combined flows of water from the Addicks and Barker dams through August 29, 2017.

9. By August 29, 2017, the combined discharges from Addicks and Barker dams into the Buffalo Bayou, in conjunction with flows entering Buffalo Bayou downstream of the dams, caused the measured flow at the Piney Point gauging station to be in excess of 10,000 CFS.

10. By letter dated September 5, 2017, the COE issued Serial Letter No. C-0039 to Granite, which directed Granite to "SUSPEND WORK" on Construction of the New Outlet Structure at the Addicks Dam site; Construction of Cutoff Walls and New Outlet Structure at the Barker Dam site; and Construction of Cutoff Walls at the Noble Road site of Barker Dam, both retroactively to August 28, 2017 and prospectively through October 15, 2017, pursuant to FAR 52.242-14, SUSPENSION OF WORK (APR 1984) (R4, tab 3).

11. The suspension of work outlined in Serial Letter No. C-0039 did not apply to contract requirements to assist in emergency repairs of damage to the dams; repairs to any part of the temporary or permanent work performed by Granite that is damaged by the flood from Hurricane Harvey; construction activities related to site recovery and restoration which could be performed safely, as conditions improved; and activities that were not affected by the flooding in and around the dams.

12. The total period of suspension ordered by the contracting officer (CO) was 49 calendar days, from August 28, 2017 through October 15, 2017.

13. After the suspension expired, Granite and the COE executed Modification No. A00030, which extended the Contract time by 49 calendar days. In part, Modification No. A00030 states that it was issued "for delays from the suspension of work due to Hurricane Harvey during the period August 28, 2017 thru October 15, 2017" (R4, tab 4).

14. Modification No. A00030 states that it is "not a release of claims by the Contractor and does not preclude the Contractor from pursuing any claim for monetary compensation from events occurring during the timeframe of the days covered in this modification" (R4, tab 4 at 003547).

15. On June 14, 2018, Granite submitted a Request for Equitable Adjustment seeking $1,250,474 and five (5) calendar days as compensation for the additional costs that it had incurred as a result of the suspension of work to the extent directed by the COE's September 5, 2017, letter.

16. On November 30, 2018, the COE and Granite executed bilateral Modification No. P00008 for $961,008 and four (4) calendar days as compensation to Granite for additional work performed and for its time-related costs associated with 30 of the 49 days for which the work was suspended. The modification referenced Hurricane Harvey and stated in part that it included "cost associated with the direction to partially suspend work on September 5, 2017 due to unprecedented rain and flooding caused by Hurricane Harvey as well as site reclamation activities required to repair the site to pre-flood conditions." (R4, tab 5)

17. Modification No. P00008 included an express reservation of rights for Granite to pursue compensation for the remaining 19 days of time-related costs in the amount of $233,779.

18. Modification No. P00008 excluded compensation for Granite's time-related costs associated with the remaining 19 days requested by Granite in part due to contract Section 01 10 00.00 45, part 1.4 which provides a chart of monthly anticipated adverse weather delay days.

3

19. Contract Section 01 10 00.00 45, paragraph 1.4 is titled "TIME EXTENSIONS FOR UNUSUALLY SEVERE WEATHER (31 OCT 1989) (ER 415-1-15)."

20. Paragraph 1.4.2, "Baseline for Monthly Weather Time Evaluations" requires the contractor's progress schedule to reflect these anticipated adverse weather delays in all weather dependent activities.

21. The exclusion of compensation for 19 days was based in part upon the anticipated adverse weather days identified in paragraph 1.4.2 of Section 01 10 00.00 45.

22. By letter dated May 23, 2019, Granite submitted a certified claim under the contract and requested a final decision of the CO. Granite's claim sought $233,779, plus interest, which represented the time-related costs that Granite alleged it had incurred as a result of an express suspension of the work by the COE. (R4, tab 6)

23. By letter dated August 30, 2019, the CO issued a final decision denying Granite's claim (R4, tab 8).

24. To date, the COE has not compensated Granite for its time-related costs associated with the remaining 19 days of claimed delay.

25. On November 26, 2019, Granite filed its Notice of Appeal to the COE's denial of its claim with the Armed Services Board of Contract Appeals (ASBCA).

The following clauses and specification are incorporated into the contract and relevant to our decision:

26. FAR 52.242-14, SUSPENSION OF WORK (APR 1984) states in pertinent part:

> (a) The CO may order the Contractor, in writing, to suspend, delay, or interrupt all or any part of the work of this contract for the period of time that the CO determines appropriate for the convenience of the Government.
>
> (b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the CO in the administration of this contract, or (2) by the CO's failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit)

4

necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly.

However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract.

(c) A claim under this clause shall not be allowed-

(1) For any costs incurred more than 20 days before the Contractor shall have notified the CO in writing of the act or failure to act involved (but this requirement shall not apply as to a claim resulting from a suspension order); and

(2) Unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of the suspension, delay, or interruption, but not later than the date of final payment under the contract.

(R4, tab 1 at 2575)

27. FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984):

(a) If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed. In this event, the Government may take over the work and complete it by contract or otherwise, and may take possession of and use any materials, appliances, and plant on the work site necessary for completing the work. The Contractor and its sureties shall be liable for any damage to the Government resulting from the Contractor's refusal or failure to complete the work within the specified time, whether or not the Contractor's right to proceed with the work is terminated.

5

This liability includes any increased costs incurred by the Government in completing the work.

(b) The Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this clause, if-

(1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. Examples of such causes include-

(i) Acts of God or of the public enemy,

(ii) Acts of the Government in either its sovereign or contractual capacity,

(iii) Acts of another Contractor in the performance of a contract with the Government,

(iv) Fires,

(v) Floods,

(vi) Epidemics,

(vii) Quarantine restrictions,

(viii) Strikes,

(ix) Freight embargoes,

(x) Unusually severe weather, or

(xi) Delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and the subcontractors or suppliers; and

(2) The Contractor, within 10 days from the beginning of any delay (unless extended by the CO), notifies the CO in writing of the causes of delay. The Contracting Officer shall ascertain the facts and the extent of delay. If, in the judgment

of the Contracting Officer, the findings of fact warrant such action, the time for completing the work shall be extended. The findings of the CO shall be final and conclusive on the parties, but subject to appeal under the Disputes clause.

(c) If, after termination of the Contractor's right to proceed, it is determined that the Contractor was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of the Government.

(d) The rights and remedies of the Government in this clause are in addition to any other rights and remedies provided by law or under this contract.

(R4, tab 1 at 2575)

28. SECTION 01 10 00.00 45 NON-REGULATED SPECIAL CONTRACT REQUIREMENTS:

1.4 TIME EXTENSIONS FOR UNUSUALLY SEVERE WEATHER (31 OCT 1989) (ER 415-1-15)

1.4.1 General

This provision specifies the procedure for determination of time extensions for unusually severe weather in accordance with the CONTRACT CLAUSE entitled DEFAULT (FIXED-PRICE CONSTRUCTION). For the Contracting Officer to award a time extension under this CLAUSE, the following conditions shall be satisfied.

1.4.1.1 Unusually Severe Weather

The weather experienced at the project site during the Contract period must be found to be unusually severe, that is, more severe than the adverse weather anticipated for the project location during any given month.

7

1.4.1.2 Completion Delay

The unusually severe weather must actually cause a delay to the completion of the project. The delay must be beyond the control and without the fault or negligence of the Contractor.

1.4.2 Baseline for Monthly Weather Time Evaluations

The following schedule of monthly anticipated adverse weather delays is based on National Oceanic and Atmospheric Administration (NOAA) or similar data for the project location and will constitute the base line for monthly weather time evaluations. The Contractor's progress schedule must reflect these anticipated adverse weather delays in all weather dependent activities.

MONTHLY ANTICIPATED ADVERSE WEATHER DELAY

WORK DAYS BASED ON 7 DAY WORK WEEK

| JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|------|-----|-----|-----|-----|-----|-----|------|------|------|-----|------|
| (11) | (8) | (6) | (6) | (7) | (9) | (7) | (10) | (13) | (10) | (8) | (10) |

1.4.3 Record

Upon acknowledgment of the Notice to Proceed (NTP) and continuing throughout the contract, the contractor will record on the daily Contractor Quality Control (CQC) report, the occurrence of adverse weather and resultant impact to normally scheduled work. Actual adverse weather delay days must prevent work on critical activities for 50 percent or more of the contractor's scheduled work day. The number of actual adverse weather delay days shall include days impacted by actual adverse weather (even if adverse weather occurred in previous month), be calculated chronologically from the first to the last day of each month, and be recorded as full days. If the number of actual adverse weather delay days exceeds the number of days anticipated in Subparagraph: Baseline for Monthly Weather Time Evaluations above, the Contracting Officer will convert any qualifying delays to calendar days, giving full consideration for equivalent fair weather work days, and issue a modification in accordance with the CONTRACT CLAUSE entitled DEFAULT (FIXED PRICE CONSTRUCTION). (R4, tab 1 at 5, 2633)

*Positions of the Parties*

Granite contends that the COE admitted that its 49 day suspension was unreasonable, "[f]irst, by compensating Granite for 30 of the 49 days of the suspension, the Government has already acknowledged that the suspension was for an unreasonable period of time" (app. mot. at 9; *see also* app. mot at 3-4). The Suspension Clause authorizes an adjustment in the cost of performance if the suspension is for an unreasonable period of time. FAR 52.242-14(b). Granite contends that the 49 day suspension was not caused by Hurricane Harvey, "[t]he 49-day duration of the delay was never based on actual adverse weather. Rather, it was based on the Government's release of waters from the Addicks and Barker dams and the associated flooding of the work site" (app. opp'n at 3; *see also* app. opp'n at 4, 6-7, 9). Granite contends, "[t]he Adverse Weather Provision has no interrelationship with the Suspension Clause, i.e., the anticipated adverse weather days contained in the Adverse Weather Provision are not actual delays and cannot be an 'other cause' of delay under the Suspension Clause. The CO was wrong to rely on the Adverse Weather Provision to deny Granite compensation for 19 days of the 49-day directed suspension" (app. mot. at 8-9). Granite argues "Contract Specification 01 10 00.00 45 (the 'Adverse Weather Provision'), and particularly Paragraph 1.4 of that Specification, provided the Government with no basis to deny Granite compensation for the full 49-day suspension period. (R4 tab 6, 003556) The Adverse Weather Provision only applies to the determination of time extensions for adverse weather under 'the CONTRACT CLAUSE entitled DEFAULT [FIXED PRICE]' (FAR 52.249-10, or the 'Default Clause'). Because the Suspension Notice was issued under the Suspension Clause, the Default Clause (and thus the Adverse Weather Provision) was irrelevant to determining whether Granite would receive compensation for the Government's directed suspension." (App. mot. at 4) "The only disputed issue is whether the 19 anticipated adverse weather days identified in the Adverse Weather Provision for the period of the suspension are an 'other cause' of delay" (app. mot. at 6).

Concerning the COE's position, the quantum amount claimed by Granite is not in dispute. By letter dated September 3, 2020, the COE stipulated that the quantum amount of $233,779 is accurate (ASBCA Case File).

The COE argues that its decision to compensate Granite for 30 of the 49 day suspension was "equitable" and not an admission that the suspension was unreasonable, "Granite received a time extension for the full period of the delay, and USACE further agreed as an equitable matter to compensate Granite for a portion of that period even though the delay had been otherwise reasonable in duration" (gov't opp'n at 3; gov't mot. at 10). The COE contends the suspension was caused by Hurricane Harvey, "[i]t is clear from the stipulated facts and administrative record that Granite's performance under the contract was impacted by the 'unprecedented rain and flooding' of Hurricane Harvey,

and Granite subsequently acknowledged and agreed to this when it executed Modifications Nos. A00030 and P00008" (gov't opp'n at 3). The COE points out, "Granite's position overlooks the important fact that when it agreed to the 49 days of time extension under Modification No. A00030, it did so pursuant to the Adverse Weather Clause of the contract (gov't opp'n at 5). The COE argues that "[o]ver the 49 calendar day period of delay resulting from Hurricane Harvey and its associated impacts from August 28, 2017 to October 15, 2017, 19 of those days were specifically anticipated by the parties as non-compensable adverse weather work days under the Adverse Weather Clause" (gov't opp'n at 5). "[T]he Default (Fixed-Price Construction) clause and the Adverse Weather Clause exclude equitable adjustments, and as such satisfy the provision of the Suspension of Work Clause as it relates to preclusion of adjustments where 'an equitable adjustment is . . . excluded under any other term or condition of this contract'. FAR 52.242-14(b)(2). The clauses, when harmonized and interpreted together, clearly contemplate that the 19 days of anticipated and actual delay resulting from Hurricane Harvey should not be compensable." (Gov't opp'n at 6)

*Legal Standard for Summary Judgment*

We evaluate the cross-motions for summary judgment under the well-settled standard: "Summary judgment is properly granted only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. The moving party bears the burden of establishing the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987) (citations omitted). In the course of the Board's evaluation of a motion for summary judgment, "our role is not 'to weigh the evidence and determine the truth of the matter,' but rather to ascertain whether material facts are disputed and whether there exists any genuine issue for trial." *Holmes & Narver Constructors, Inc.*, ASBCA Nos. 52429, 52551, 02-1 BCA ¶ 31,849 at 157,393 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). A material fact is one which may make a difference in the outcome of the case. *Liberty Lobby,* 477 U.S. at 248. The opposing party must assert facts sufficient to show a dispute of material fact. *New Iraq Ahd Co.*, ASBCA No. 59304, 15-1 BCA ¶ 35,849 at 175,291-92 (citing *Mingus*, 812 F.2d at 1390-91) ("To ward off summary judgment, the non-moving party must do more than make mere allegations; it must assert facts sufficient to show a dispute of material fact."); *see Lee's Ford Dock, Inc.*, ASBCA No. 59041, 16-1 BCA ¶ 36,298 at 177,010. However, questions of law are susceptible to summary judgment. *R.L. Persons Const., Inc.*, ASBCA No. 60121, 18-1 BCA ¶ 37,007 at 180,236-237 ("Contract interpretation— particularly the issue of whether a contract is ambiguous—is a question of law that generally is amenable to summary judgment.")

10

*Rules of Contract Interpretation*

The basic rules of contract interpretation were well-stated in *TEG-Paradigm Envtl, Inc. v. U.S.*, 465 F.3d 1329 (Fed. Cir. 2006):

> When interpreting a contract, "'the language of [the] contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances.'" *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999) (quoting *Hol-Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 351 F.2d 972, 975 (Ct. Cl. 1965)).

*TEG-Paradigm*, 465 F.3d at 1338; *see also LAI Services, Inc. v. Gates*, 573 F.3d 1306, 1314 (Fed. Cir. 2009).

The contract must be read as a whole:

> Contract interpretation begins with the language of the written agreement. *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993). When interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts. *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434-35 (Fed. Cir. 1996). An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous. *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)

*NVT Technologies, Inc. v. United States,* 370 F.3d 1153, 1159 (Fed. Cir. 2004). A contractor's interpretation need not be the best interpretation, it need only be within the "zone of reasonableness." *States Roofing Corp. v. Winter*, 587 F.3d 1364, 1369 (Fed. Cir. 2009).

*Reasonableness is a Question of Fact*

The parties dispute whether the 49 day suspension period was "reasonable," as that word is used in the Suspension Clause, or not. Granite contends that the fact the COE compensated it for 30 of the 49 days of suspension is an admission that the delay was unreasonable (app. mot. at 9; app. opp'n at 3-4). The COE counters that it compensated Granite based on "equity" and not a belief that the 49 day suspension was unreasonable (gov't opp'n at 3; gov't mot. at 10). Whether a government-caused delay is

reasonable or unreasonable depends on the particular circumstances of the case. *P.R. Burke Corp. v. United States,* 277 F.3d 1346, 1360 (Fed. Cir. 2002) ("What is a reasonable period of time for the government to do a particular act under the contract is entirely dependent upon the circumstances of the particular case."). Given the disputes about the circumstances here, we have a disputed material fact that precludes resolution of that fact by summary judgment.[1] However, we can decide the matter of the proper interplay and interpretation of FAR 52.242-14, Suspension of Work, FAR 52.249-10, Default (Fixed-Price Construction), and SECTION 01 10 00.00 45, 1.4 TIME EXTENSIONS FOR UNUSUALLY SEVERE WEATHER which is a question of law.

*Interpreting the Default Clause, Suspension Clause and* SECTION 01 10 00.00 45 *does not Support Deducting Anticipated Severe Weather Delay from the Suspension Period*

The Default Clause, FAR 52.249-10, Default (Fixed-Price Construction), defines the facts supporting a decision to terminate a contract for default. The primary basis encompassed in the clause for the right to terminate is based on a contractor's unsuccessful completion of the contract within the "time specified." However, the clause provides a defense to termination through a contractor's right to an extension in time for delay arising from, "unforeseeable causes beyond the control and without the fault or negligence of the Contractor." FAR 52.249-10(b)(1). The Default Clause includes a list of examples of "unforeseeable causes" of delay. *Id.* One of the examples is "Unusually severe weather." FAR 52.249-10(b)(1)(x). If delay was caused by unusually severe weather, the CO "shall" extend the time for completing the work. FAR 52.249-10(b)(2). There is no right to compensation in the Default Clause, only the right to additional time to avoid default. There is nothing in the Default Clause linking it in any way to the Suspension of Work Clause, FAR 52.242-14.

Contract Specification SECTION 01 10 00.00 45, 1.4 TIME EXTENSIONS FOR UNUSUALLY SEVERE WEATHER, provides guidance to the CO in determining if weather is "unusually severe" for purposes of the Default Clause (SOF ¶ 28). There are several prerequisites to be satisfied before a time extension "shall" be granted under the Default Clause. Section 1.4.1.2 Completion Delay requires that the delay be on the critical path, i.e., the unusually severe weather must actually cause a delay to the completion of the project. Section 01 10 00.00 45 includes a list of monthly "anticipated adverse weather delay" as follows:

---

[1] We do not discuss Granite's contention that the delay was not caused by Hurricane Harvey because that argument seemed farfetched and immaterial. Granite, however, is free to pursue and explain this contention if it desires.

MONTHLY ANTICIPATED ADVERSE WEATHER DELAY

WORK DAYS BASED ON 7 DAY WORK WEEK

JAN FEB MAR APR MAY JUN JUL AUG SEP OCT NOV DEC
(11) (8) (6) (6) (7) (9) (7) (10) (13) (10) (8) (10)

The contractor must incorporate the monthly anticipated adverse weather delay in its Critical Path Method (CPM) schedule (1.4.2 Baseline for Monthly Weather Time Evaluations). That means the anticipated adverse weather delay, if it occurs, would not cause a critical path delay because it is already built into each month's schedule. Therefore, such a delay would not be cause for the CO to extend the time to complete the contract. Relatedly, the listed monthly anticipated adverse weather delay is used to calculate the delay caused by "unusually severe weather" for use in accordance with the Default Clause. To be considered "unusually severe weather," the actual delay for each month must exceed the anticipated adverse weather delay for the time period involved. *Advance Constr. Servs., Inc.*, ASBCA No. 55232, 11-2 BCA ¶ 34,776 at 171,133 ("Thus, under Section b of this provision,[2] referred to hereinafter as the Unusually Severe Weather clause, the contractor will only be allowed a time extension due to weather in a given month for days in excess of those already accounted for in the contract."). For example, in this appeal the parties agree that there are nineteen (19) days of anticipated adverse weather delay (SOF ¶¶ 17-18, 21, 24). This is based on the forty-nine (49) day suspension from August 28, 2017 to October 15, 2017 (SOF ¶ 12). The 19 days is comprised of one (1) day from August, thirteen (13) days from September and five (5) days from October based on the monthly anticipated adverse weather delay listed in the specification. Therefore, days of severe weather delay over the 19 days between August 28, 2017 and October 15, 2017, would qualify as "unusually severe weather" justifying an extension pursuant to the Default Clause. Applying the rules of contract interpretation quoted above, there is nothing in SECTION 01 10 00.00 45 providing for the 19 days of anticipated adverse weather delay to be subtracted from the 49 days of suspension imposed under the Suspension of Work Clause. Moreover, there is nothing in SECTION 01 10 00.00 45 providing for compensation for the unusually severe weather. The Section only defines what constitutes "unusually severe weather" for the CO's use in determining if default is excused under the Default Clause. There is nothing in SECTION 01 10 00.00 45 linking it and the Default Clause in any way with the

---

[2] The "provision" is an Unusually Severe Weather Clause substantially the same as SECTION 01 10 00.00 45, 1.4 TIME EXTENSIONS FOR UNUSUALLY SEVERE WEATHER (SOF ¶ 28).

Suspension of Work Clause, FAR 52.242-14.  That brings us to the Suspension of Work Clause itself.

The Suspension of Work Clause, FAR 52.242-14, allows the CO to "suspend, delay, or interrupt" work under the contract (SOF ¶ 26).  If the suspension is reasonable there is no cost to the government.  If the suspension is caused (1) by an act of the CO in the administration of this contract or (2) by the CO's failure to act within the time specified in this contract, and is "unreasonable," the contractor is entitled to an adjustment in its cost to perform.  Unusually severe weather cannot be caused by the CO's action or failure to act so it cannot trigger a cost increase under the Suspension of Work Clause.  Moreover, there is a "no adjustment" provision Clause, which provides that, "to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract" there shall be no adjustment in the cost to perform (SOF ¶ 26).

The government argues that the Adverse Weather Clause combined with the Default Clause, basically provides that the contractually-anticipated days of bad weather for each month are excluded from compensation.  Thus, according to the COE, these anticipated days of bad weather are precluded by the "no adjustment" clause.  (Gov't br. at 8-9)  But the Adverse Weather Clause is applicable only to the Default Clause and is only used to calculate the number of days for which weather delays provide an excuse for late performance, as discussed above; its language does not purport to either provide for or exclude an equitable adjustment for weather delays.  Accordingly, there is no basis to find that the days excluded for purposes of Default Clause time extension calculations are also excluded from compensation by the "no adjustment" section of the Suspension of Work Clause.  Thus, if Granite can prove entitlement to an "adjustment" to its cost of performance under the Suspension of Work Clause, the Default Clause would not trigger the "no adjustment" provision of the Suspension of Work Clause.

Granite seeks $233,779, undisputed by the COE, for the 19 days associated with the anticipated adverse weather delay in Section 01 10 00.00 45.  We have found that there is no link between the Suspension of Work Clause and the Default Clause which brings Section 01 10 00.00 45 into play with the Suspension Clause.  Therefore, the COE's interpretation that the 19 days of anticipated adverse weather delay may be subtracted from the 49 days of suspension based on Section 01 10 00.00 45 is not within the "zone of reasonableness." *States Roofing*, 587 F.3d at 1369.  To the extent the COE argues that the contract interpretation guidance "[w]hen interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts" (*NVT Technologies, Inc.*, 370 F.3d at 1159) somehow justified subtracting the 19 days of anticipated adverse weather from the 49 days of suspension, we reject the argument.  All that is left is for the COE to prove that the suspension was reasonable and as such Granite is not entitled to any more

14

compensation than what the COE gave it based on "equity." Alternatively, Granite would need to prove that the suspension was unreasonable. As we discussed above, "reasonableness" involves questions of disputed material fact not susceptible to resolution by summary judgment.

CONCLUSION

In accordance with the above we grant partial summary judgment to Granite and leave the question of the reasonableness of the suspension period for further proceedings.

Dated: December 3, 2020

CRAIG S. CLARKE
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62281, Appeal of Granite Construction Company, rendered in conformance with the Board's Charter.

Dated: December 8, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

15