ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of -- | ) | |
| | ) | |
| AISG, Inc. | ) | ASBCA Nos. 58696, 59151 |
| | ) | |
| Under Contract No. W5J9JE-10-C-0039 | ) | |

APPEARANCES FOR THE APPELLANT:
Lochlin B. Samples, Esq.
Karl Dix, Jr., Esq.
Parker A. Lewton, Esq.
Steven Stuart, Esq.
J. Daniel Puckett, Esq.,
  Smith, Currie & Hancock LLP
  Atlanta, GA

APPEARANCES FOR THE GOVERNMENT:
Michael P. Goodman, Esq.
  Engineer Chief Trial Attorney
Rebecca L. Bockman, Esq.
Cara M. Mroczek, Esq.
Aimee L. Rider, Esq.
  Engineer Trial Attorneys
  U.S. Army Engineer District, Middle East
  Winchester, VA

Edward J. McNaughton, Esq.
  Engineer Trial Attorney
  U.S Army Engineer District, Memphis

OPINION BY ADMINISTRATIVE JUDGE KINNER

Appellant, AISG, Inc. appeals from a decision by an Army Corps of Engineers Contracting Officer (CO) which denied its claim for costs incurred before it began construction of a police headquarters in eastern Afghanistan. A hearing of this dispute was conducted at the Board, September 10-13, 2018.

FINDINGS OF FACT

To fulfill a requirement of the Combined Security Transition Command-Afghanistan/NATO Training Mission-Afghanistan, the United States Army Corps of Engineers (the Corps) contracted with AISG for the design and construction of a Uniformed Police District Headquarters (DHQ) and associated structures in Sar Hawza, Paktika, Afghanistan (R4, tab 60 at 79; gov't br. at 1-2).

The plans for the DHQ are a common design the Corps used for many similar facilities (tr. 3/277). The contract was awarded September 3, 2010 and construction was required to be completed within one year. (R4, tabs 2 at 1, 3, 10) The diagram and photos in the original contract show the construction site, referred to as site #1, just outside the perimeter wall of the forward operating base (FOB) (R4, tab 60 at 1064, 1066-67, 1069-72, 1075).[1] Subsequent encroachment on that site by the military made it unusable and the Corps was forced to find a new location (gov't br. at 9 ¶ 34; tr. 4/300-04).

Locating and establishing a new site for the work required several steps, including resolution of right-of-entry and land use issues which was delayed by the change of the Afghan sub-governor (gov't br. at 9-11 ¶¶ 35-40, 39 ¶ 132; R4, tab 158 at 2; tr. 4/304-05). The difficulties in this and similar real estate efforts made the Corps hesitant to consider recommendations to relocate the construction site (gov't br. at 11 n.11; tr. 4/182-83, 233-35).

Mr. Robert Sokoloski was the Corps' project engineer for the contract (R4, tab 14). On March 5, 2011, he conducted an investigation of a proposed new construction site (id.). His report of that investigation shows a site close to the village of Sar Hawza (id. at 2-3). He reported that the location he investigated was preferred by the local government due to its proximity to the village (id. at 1). The sub-governor requested that the site be located closer for the village (id.). Mr. Sokoloski provided coordinates for the proposed site (id.). He recommended that location because there were "little to no obstructions for construction activities" (id. at 3). He concluded that construction could commence on that site if water was confirmed and no adverse land ownership issues arose. That report, and Mr. Sokoloski's conclusions, were not subsequently finalized or approved by the Corps (gov't br. at 15 n.16). Thus, Mr. Sokoloski's report did not establish a new site for the construction.

NATO instructions governed requests for land to support Afghan forces, and the appropriate legal authority to occupy the land on which to build Afghan infrastructure projects (R4, tabs 118 at 2, 120). In accordance with NATO instructions, the Corps contracted with JQ Builders to perform an assessment of the site selected as the new location for the construction (R4, tab 15 at 2). The May 28, 2011 report by JQ Builders reflects its understanding that the site assessment was following the master plan by the Afghan Ministry of Interior (MOI), (id. at 4).

---

[1] The proposed locations for construction identified in the photos and site maps were referred to by number. Site #1 was the original site next to the FOB (app. br. at 9 n.6; tr. 1/36, 2/205). The parties stipulated that three other locations were identified: the Riles/Sokoloski/tab 14 coordinates, site #2 and site #3, depicted on the exhibits by color respectively as green, red and blue (tr. 2/22-23, 203-04).

JQ Builders was performing the assessment of Afghan government-owned land in three police districts (*id.* at 9). The site it evaluated for this contract is at the center of the police district, with an Afghan National Police (ANP) post at the center of the site (*id.* at 4).

In addition to the ANP post, the site was noted to be "hard rock" and considerable cutting and grading would be required to create a buildable site (*id.* at 5). JQ Builders verified that the new site was on property owned by the Afghan government by producing documents "signed by all possible government officials and local elders" (*id.*). The report included copies of those documents in Pashto, Dari and English translations (*id.* at 14-27). An attachment to the report is the police chief's letter which states that local Shura elders, government officials and the local NATO commander visited and selected the site (*id.* at 15). The report also stated that "[t]he surrounding area around the proposed site is private land; there is no possibility for the extension of the proposed site to the surrounding area. Facility will be constructed [within] the border of the Grid Coordinates" (*id.* at 5). The photographs accompanying the report clearly depict the ANP post at the center of the proposed construction site (*id.* at 29-30). The parties identified this site as site #2.

On May 17, 2011 the Corps and Afghan representatives executed a new License for Construction for site #2 (R4, tab 116). The agreement was signed by the Afghan Deputy Governor, the sub-governor, the Sar Hawza police commander and the Afghan director of Agriculture and Land Department (*id.* at 14). The documents provided with the JQ Builders report were included with the license to construct (*id.* at 11-16). The site sketch included with the license depicted an ANP post located on the site (*id.* at 14). AISG did not receive a copy of this license during contract performance (tr. 1/97, 4/304-05) nor did AISG ever ask to see the license (tr. 1/292).

Another Corps project engineer, Jeffrey Blackwell, visited the site on June 19-20, 2011 (R4, tab 16). Mr. Blackwell met the sub-governor, who confirmed the official Afghan support for site #2. In his report, he explained the new DHQ would be an additional facility rather than replacement or enlargement of the ANP post (*id.* at 1). He understood that, in 2010, the sub-governor and local government officials had requested a site near the village (*id.* at 2). Mr. Blackwell noted "there is sufficient area for the proposed ANP DHQ at this area, once the existing ANP structure is demolished" (*id.*). But he considered the extensive rock at the site to be a condition that had to be considered in plans for construction (*id.* at 3). Mr. Blackwell believed building at site #2 would provide an additional ANP facility where one is most needed, closer to the village, which was preferred by both local officials and the Army (*id.* at 4).

On July 15, 2011, the Corps requested a proposal (RFP) from AISG for the price to relocate the construction site from site #1 to site #2 (R4, tab 17). The request stated it would be the design-build contractor's responsibility to provide all necessary

design documents for site adaptation (*id.* at 1). The request included an aerial photo with an outline of the site and its coordinates (*id.* at 3).

AISG's subsequent proposal to move to site #2 explained that AISG management had visited site #2 on July 25, 2011 (R4, tab 114 at 2; tr. 1/57). Rather than describe potential difficulties with the site, the proposal informed the Corps that "*AISG, Inc. is in agreement with all the terms, conditions and provisions in the RFP and agree to furnish any or all items upon which prices are offered at the price set opposite each CLIN item*" (R4, tab 114 at 1 (emphasis in original)). AISG described how it would construct the police headquarters by removing the ANP post and the village wall (*id.* at 3). The proposal included pictures showing the boundaries for the new site that encompassed the ANP outpost and the bottom corner overlapping the corner of the village wall "20-30 meters which will require removal" (*id.* at 2). The ANP post was described as "HESCO construction" which AISG proposed to disassemble to allow the HESCO materials to be reused (*id.* at 2-3). The ANP post could be disassembled because HESCO walls are wire baskets filled with dirt. AISG described how it would begin construction at the village wall to ensure security for the village (*id.* at 3).

As discussed in the JQ Builder's report, the company understood the site had rock outcroppings which required removal with heavy equipment and leveling to prepare the hill upon which the ANP outpost sat for construction (*id.* at 4). The proposal specifically included "security for site personnel, materials, and life support area [LSA] for work force" (*id.* at 5). AISG indicated it spoke with Afghan army and police commanders who informed it that there were significant insurgent activities in that area (*id.* at 4). There is no mention in the proposal of concern by the Afghan army or police that the ANP did not want its outpost removed. Nor did AISG indicate that anyone from the village informed it that the portion of the wall overlapped by site #2 should not be removed.

The parties agreed to Modification No. 2 to the contract to relocate the construction to site #2 (R4, tabs 3-4). That modification was intended to include all costs to relocate the work (*id.* at 3). As in the RFP, the modification noted the design-build contractor's responsibility to provide all necessary documents for site adaptation (*id*. at 2). Mr. Dana Lilly, director of construction, signed Modification No. 2 for AISG on January 16, 2012 (*id.* at 1). The Corps' price negotiation memo for Modification No. 2 reflects that the parties agreed to eliminate the line item for removal of the ANP post because taking down HESCO walls is too minor a task to be considered separate from site preparation (R4, tab 167 at 2-3). The line item for removing the village wall was also eliminated when the Corps determined a HESCO wall would be built next to the village wall at that spot (*id.* at 3). The overlap of the construction site with the village wall was not a concern to AISG (tr. 1/163-65).

Mr. Lilly contacted the newly arrived contracting officer's representative (COR), Mr. Dennis Riles, by email on February 28, 2012 from Kabul (tr. 1/170-71). First, he sent a message to Mr. Riles saying: "Please be advised that we are planning to arrive by helicopter to do a site survey with AISG company President Mr. Carter Andress at approximately 1300 to 1400 hrs. today and wish to meet with anyone from your group who has oversight to that area and project" (R4, tab 204 at 2). AISG had not provided advance notification of its plan to visit the site. In the afternoon, Mr. Lilly followed-up his request with a telephone call and a second email asking Mr. Riles: "For conformation purposes, can you forward to me the exact coordinates of the site we are going to visit" (*id*. at 1; *see* tr. 3/301). It is not clear why that information was not available to AISG either from the contract documents, its proposal or AISG management's visit to the site in July 2011.

Mr. Harry Carter Andress (H.C. Andress), chairman, president and principle owner of AISG, made that trip because he occupied a quasi-CEO role in Afghanistan while his brother Mr. Kiffer Andress, who was CEO, was focused on contracts in Iraq (tr. 1/56). Mr. H. C. Andress had received the information Mr. Riles had provided in response to Mr. Lilly's email request (tr. 4/294). He was pleased with the site identified by the coordinates Mr. Riles provided because there were no obstructions to construction on that terrain (tr. 4/294). Mr. H. C. Andress was aware that an ANP checkpoint was located on the contract site, because AISG had pictures of site #2 from its pre-proposal July 2011 visit (tr. 4/295). He testified that he was aware of a critical conflict with the ANP post where AISG was to perform the construction (tr. 1/58, 4/294-95). Mr. H. C. Andress asserted that AISG recognized the site was untenable on its July 2011 visit and told the Corps at that time (tr. 1/63-64). There is no other evidence that AISG raised a concern about site #2 in 2011. Upon his return from the site visit, Mr. H. C. Andress did not question why the site he visited on February 28, 2012 contained none of the features that were present at the site specified in the contract or described in AISG's proposal.

Mr. Riles had little recall of his role for this contract. He never visited the site because no work was occurring while he was assigned to the project (tr. 3/281). Although Mr. Riles had been in Afghanistan since September 2011, and he was appointed as the COR in February 2012, (R4, tab 199), he had no knowledge of events relevant to this dispute before his appointment (tr. 3/326-27). Mr. Riles did not know the ANP checkpoint was on site #2 (tr. 3/338-42).

Mr. Riles remembered responding to Mr. Lilly's morning email on February 28 to explain that he could not join the AISG site visit because he would need to coordinate with Army force protection officials (tr. 3/296; R4, tab 204 at 2).[2] When responding

---

[2] The solicitation contained Federal Acquisition Regulation (FAR) 52.236-27, SITE VISIT (CONSTRUCTION) (FEB 1995), which explicitly warned AISG that the government would not provide a representative or security for a site visit.

to Mr. Lilly's second email, he first looked for the site location information in the resident management system (RMS), which the Corps uses to administer the contract (tr. 3/289-90, 3/296, 3/336-40; R4, tab 60 at 218). Finding none, he recalled a site assessment, which he thought would have the requested information (tr. 3/296). He found the assessment done by Mr. Sokoloski, from which he extracted coordinates that he believed would at least get AISG close to the site (tr. 3/296-97, 336-37, 349; R4, tab 14 at 1).

His response email to Mr. Lilly stated: "these are the coordinates as I know them" listing the Sokoloski coordinates (R4, tab 204 at 1). Mr. Riles sent those coordinates to AISG for "confirmation purposes" (*id.*). He expected AISG to confirm the coordinates with the information it possessed and raise any question promptly (tr. 3/326). But, Mr. Riles did not know what location those coordinates reflected or if they related to the contract. He gave the Sokoloski report only a cursory review and clearly did not understand that the Sokoloski coordinates did not reflect the construction site in the contract. (Tr. 3/340-43) Based upon his reliance on the Sokoloski coordinates when responding to Mr. Lilly, he directed the AISG project manager to the same coordinates in response to a similar inquiry on March 15, 2012 (R4, tab 227). Mr. Riles explained that the email from the AISG project manager did not explain what AISG was looking for so he simply again referred to the Sokoloski coordinates (tr. 3/327).

Mr. Riles and his supervisor, Phil Stavrides, also met Mr. H. C. Andress when the AISG representatives arrived at the FOB helicopter landing zone returning from their site visit (tr. 3/298-99, 4/293-94). They met for 35 to 45 minutes (tr. 3/322, 4/294). Mr. H. C. Andress did not raise a concern about the construction site in that meeting (tr. 3/298-99, 4/294-95). The conversation was primarily about life support issues for AISG employees (tr. 3/298-99, 4/294-95). Mr. H. C. Andress was exploring whether the government would allow AISG personnel to stay on the FOB and to use the hospital and eating facilities (tr. 3/298-99). Mr. Riles did not participate in the life support discussion (tr. 3/299).

AISG counsel stipulated that the contractor had internally discussed nine different sets of coordinates before using the coordinates that were provided by Mr. Riles (tr. 4/112). It mobilized its subcontractors to yet another location close to site #2. AISG did not recognize that its subcontractors started work on the wrong site until April 25-26, 2012, when the Corps project engineer, Jonathan Jenkins, corrected the company's misunderstanding (R4, tab 267 at 2). An AISG employee, Rock Mikel, then selected yet another set of coordinates to shift the work away from the village wall (R4, tabs 288-289 at 1). Those coordinates became site #3, AISG's preferred site. The

Offerors were expected to inspect the site, which would be done at their risk. (R4, tab 60 at 19)

6

subcontractor who had been performing leveling and grading laid out site #3 and informed the villagers about site #3 (R4, tabs 288, 343 at 44). On May 10, 2012, Mr. Paul Osterhout, an AISG senior project manager, provided those coordinates to AISG management personnel as a recommendation for a different project site (R4, tab 288).

Mr. Osterhout also forwarded his recommendation for site #3 by email to AISG's new Afghan country manager, Mr. Frank Guffey, on May 10, 2012 (R4, tab 294 at 2, 6-9). His recommendation to change the site was based upon the presence of the ANP checkpoint and substantial rock formation in site #2 (*id.* at 4-9). He recommended that changing the site would avoid leveling the hill as well as the difficult construction necessary to install the septic tank and leach field due to the rock vein (*id.* at 7-8). He conveyed that the district police commander supported construction at the recommended site (*id.* at 8-9). Mr. Osterhout stated AISG's subcontractor was expected to obtain a letter from the district police commander attesting to his support for the new site (*id.* at 9). On May 11, 2012, Mr. Jenkins informed AISG that the Corps only had authorization from the Afghan government to work within the boundaries of the site in its license for construction (*i.e.*, site #2) ( *id.* at 1-2; *see also* R4, tabs 72, 343 at 2-3). He warned that obtaining a deviation from that license would require a "long tedious process." He told them if AISG wanted to change the construction site it needed to formulate a request for information (RFI) to inquire about such a change (*id.*). On May 12, 2012, Mr. Guffey asked Mr. K. Andress to prepare an RFI to change the coordinates of the construction site (R4, tab 294 at 1).

Despite its interest in obtaining a better site, AISG was late with pre-construction submissions required by the contract causing the Corps to issue an interim unsatisfactory performance evaluation (R4, tabs 31, 314 at 4). AISG had difficulty with submittals. Among other issues, it had assumed that the coordinates Mr. Riles provided in his February and March 2012 emails amended the contract to change the construction site (app. br. at 14; R4, tab 158 at 20). AISG's accident prevention plan was submitted in February, but for the Sokoloski coordinates (tr. 1/136). AISG should have known Mr. Riles did not possess authority to change the contract (R4, tab 199 at 2-3, 6). But AISG claimed that it had filed many of the required submittals and it was waiting to submit more once the site was changed (R4, tab 343 at 6, 10). AISG was only interested in working on site #3, and it acknowledged in its response to the unsatisfactory rating that its mobilization of its subcontractors was at the company's expense (*id.*). The Corps, however, was only interested in progress on the contract site and not an attempt to change the site (*id.* at 2-3).

The first RFI submitted by AISG, on May 19, 2012, informed the Corps that site #2 included the ANP outpost and overlapped the village wall, as evident in the RFP for Modification No. 2 and AISG's proposal (R4, tab 34 at 12). AISG stated that the Afghan district governor and the police commander agreed that site #3 was a logical

7

location on which to build because that would avoid moving village structures and paying compensation to the villagers (*id.*). That discussion ignored the resolution by the parties of that issue during negotiations for Modification No. 2. AISG also recommended site #3 because it would offer better security with more standoff distance and its subcontractors had already swept site #3 for unexploded ordinance (*id.*). AISG had not been authorized to perform work on site #3 because that was outside the limits of the license for construction. The RFI did not state that AISG could not build on site #2. Rather, AISG insisted Mr. Riles had suggested a different site, there would be unnecessary costs to work with villagers on site #2, and the ANP post had to be moved to use that site (*id.*).

The Corps' consideration of AISG's RFI focused on the limitations established by the license for construction (R4, tab 331). The Corps rejected the move proposed by AISG because the license set the coordinates the Corps was required to build within, so the Corps concluded it "can't move site like contractor wants to." (*Id.* at 1) The Corps did not appear concerned regarding the village wall because AISG did not have to build to the boundaries of the site. The government did not expect AISG to knock down the village wall. The Corps specifically addressed the wall, not the ANP checkpoint. It was known that during discussions for Modification No. 2 the plan was to remove the ANP post as part of the construction (R4, tab 167 at 1-3).[3] Thus, the government's only response to the RFI was to confirm the coordinates of site #2, and to state "construction can be site-adapted within the footprint" (R4, tab 34 at 13).

Mr. Neil Francis, an AISG vice president, had a similar view. Following the government's response to RFI 1, Mr. Francis told Mr. Osterhout that the ANP post did not present a problem because he expected the ANP to cooperate when they were getting a new police station (R4, tab 356 at 3). Mr. Francis also believed AISG could

---

[3] Corps witnesses asserted that AISG could have adapted the construction around the ANP outpost by adjusting the order of construction or making accommodations for the ANP to continue a road check point (LaRosa deposition 39 declaration ¶¶ 13-14; tr. 4/168-69, 4/231-34). That testimony is not credited. The weight of evidence supports the contrary conclusion that the ANP post had to be removed to build the DHQ. That point is stated elsewhere in Mr. La Rosa's deposition, in Mr. Jenkins' deposition testimony, in the government's site assessments, in AISG's proposal, and shown in the spatial calculations discussed in cross examination of Ms. Chew. *See e.g.*, tr. 4/233-35; R4, tabs 114, 499. In fact, government counsel acknowledged that site #3 was a better site (tr. 2/206). Also, when pointing out that Mr. La Rosa agreed in his deposition that AISG would have to move the ANP outpost to build the DHQ, AISG argues Mr. La Rosa's declaration cannot be considered to offer factual evidence due to numerous significant infirmities in form and substance of the affidavit, especially the electronic signature of that document (app. reply br. at 6-10).

8

adapt around the village wall (*id*.)  He informed AISG management in a conference call that its subcontractor needed to be promptly pushed to start the site layout on site #2, to get a scheduler, and to change the well site (*id.* at 2).  He warned AISG personnel that they needed to carefully follow the contract submittal requirements (*id.*).  "Each of you needs to be reading the specifications, drawings, SOW" "every free minute of time" (*id.*).  There was no mention in that conference call that AISG could not work on site #2.  There was a concern, however, that construction on site #2 would be far less profitable for AISG.  Mr. Guffey explained to Mr. Francis and Mr. K. Andress, that preparatory work performed by AISG's subcontractors on site #3 would have to be redone to work on site #2 (R4, tab 385).  He warned Mr. K. Andress that site work on site #2 would be costly and require 65 more days to complete, reducing the company's profits from $1 million to $255 thousand (R4, tabs 370-371).

        With AISG's focus on site #3, the parties began to work at cross purposes.  While AISG pursued site #3 as its desired construction site, the government was expecting progress in accordance with the contract on site #2.  At the time AISG submitted RFI 1, the government had sent a letter telling AISG that it had to stop work because its mobilization was in violation of the contract when there had been only one submittal (R4, tab 314 at 4).  Ignoring the Corps' expectation that submittals would be accomplished for site #2, Mr. Guffey responded that AISG had met the contract requirements to start work and it was waiting on the government's response to RFI 1 so that it could complete site-specific submittals on site #3.  He informed his management that AISG would receive a letter authorizing mobilization once it completed submittals after a modification to change the location was approved (R4, tab 314 at 1).

        This disconnect continued through the summer.  On June 9, 2012, Mr. James Fuquay, the Corps quality assurance representative, asked Mr. Osterhout when AISG could start construction on site #2 (R4, tab 341 at 2).  In response, Mr. Osterhout stated work on site #2 was "not tenable" due to the presence of the village wall and the ANP post (*id.* at 1).  Mr. Osterhout offered that AISG could begin work within 48 hours if the Corps accepted site #3 (*id.* at 2).  Consistent with the disconnect, Mr. Fuquay replied that site #3 was not being considered and "[t]he check point will have to go at some point during construction after you get the go ahead and have some structures up."  (*Id*. at 1)

        Undaunted, AISG submitted its second RFI on August 12, 2012 (R4, tab 43).  That RFI focused on the presence of the ANP checkpoint and the lack of stand-off distance to the village.  AISG stated the district commander and police commander agreed that site #3 was the logical place to construct the DHQ (*id*. at 1).  To support its request, AISG provided letters from the district commander, the district chief and district residents (*id.* at 6, 8, 10).  The letters from the Afghan officials echoed AISG's preference to use a location its subcontractor had begun to prepare.  The letter from the residents states their desire that the new construction not interfere with the village

9

bazaar. (*Id.*) Unsurprisingly, the Corps' response reiterated that the DHQ must be constructed within the boundaries set in the contract because the Corps did not have authority to deviate from the limits set in its license to construct (*id*. at 1).

The Corps clearly had no intention of undertaking the process to obtain a license from Afghan authorities for another construction site. To the contrary, the Corps continued to pursue progress in accordance with the contract on site #2. On August 6, 2012, it issued a cure notice to AISG for its failure to complete the required submittals since Modification No. 2 in October 2011. On the date of the cure notice, only 32 days remained in the performance period. (R4, tab 42) AISG responded to that notice arguing that it had completed the majority of the submittals and it was waiting for a response from the Afghan MOI to change the site. Apparently recognizing its obligations under the contract, AISG also promised to build on site #2 if the Corps would not reconsider its rejection of the prior RFIs. But the company again told the Corps that local Afghan "customers could severely disrupt the construction." (R4, tab 44) Nonetheless, following a meeting with the CO, AISG submitted a recovery schedule to reflect its ability to complete the contract (R4, tab 486). Listed under demolition and grading on that schedule, AISG planned for the demolition of the ANP post (*id.* at 30). The plan also acknowledged that the prior work on site #3 was not authorized (*id.* at 33).

On August 29, 2012, AISG submitted its third RFI (R4, tab 45). AISG reiterated that a corner of site #2 overlapped the village wall and "there was a risk of incurring unnecessary resentment from the Village" residents and Afghan officials if construction occurred on that site (*id*. at 1). AISG provided a certification from the Afghan MOI that site #3 was Afghan government property with no private ownership claims, which authorized the Corps to proceed with construction of the DHQ on that site (*id.* at 6). The Corps' response informed AISG that it was preparing an RFP to move to site #3 (*id.* at 17). The Corps issued the RFP to relocate the construction to site #3, and Modification No. 7 as a no-cost change with a 393-day extension (R4, tabs 9, 46, 626). The reason given in the Corps' basic change document is that "[t]he original site conflicts with existing buildings, an ANP checkpoint, perimeter wall, access road, etc. A revised location is necessary to continue construction without interfering with existing structures and the local village" (R4, tab 593).

On April 2, 2013, AISG submitted a claim seeking $700,300.54 for delay costs it incurred between the denial of its first request to move the site in May 2012, and the end of December 2012, when the Corps agreed to move the construction to site #3 (app. br. at 3 n.1; R4, tabs 54, 54-C, 56). The delay costs consist of direct costs to maintain the LSA on the site during that 8-month period (app. br. 25-28, 37-41). AISG appealed to this Board on June 12, 2013, asserting a deemed denial of its claim. That appeal was docketed as ASBCA No. 58696. The Corps issued a final

decision denying the claim on February 8, 2014. AISG appealed the final decision, which was docketed as ASBCA No. 59151 and consolidated with ASBCA No. 58696.

DECISION

AISG cannot recover the costs requested in its claim because it has failed to prove government responsibility for the amounts incurred during that time period. There is no legal theory upon which AISG can support its claim.

A. AISG was not denied access to the work site.

AISG's claim rests upon allegations that the Corps had not obtained authorization for construction on site #2 (app. br. at 1, 5, 8, 11-13, 20-21, 31-32, 35) and that it could not gain access to site #2 due to the presence of the ANP post (app. br. at 4, 13-14, 18). AISG has the burden of proving the fundamental facts of liability and damages. *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (en banc), *accord J.C. Equipment*, ASBCA No. 51321, 02-1 BCA ¶ 31,810 at 157,156. AISG fails to meet its burden regarding authorization because the Corps had secured a license to build the DHQ on site #2. AISG failed to present any evidence of any infirmity in the Corps' fully executed license, much less that it was invalid. Mr. Guffey presumed the Corps did not have a license, yet he never asked to see the license the Corps referred to or even for an explanation of why the Corps insisted construction could only occur on site #2 (tr. 1/292). AISG's allegations that the Corps procured that license by deceit or that the license did not authorize continuous access to the site for three years are specious and unsupported. The Corps reasonably relied upon the license it received from the Afghan MOI to expect AISG to perform the contract on that site.

AISG did not prove the ANP or other Afghans prevented AISG from entering site #2 to perform the work. The underlying premise of AISG's RFIs and subsequent claim is that opposition by the local residents or even the ANP could have become violent (tr. 1/290-91). In its RFIs, AISG proposed the possibility that Afghan residents or the ANP would violently object to the work of the contract. Those suggestions were no more than supposition based on such an incident that had occurred at another site. In contrast, AISG did not encounter physical interference at site #2 (tr. 1/238). This is not to say that the location of the project was not a violent dangerous place, but there is no evidence that AISG attempted to perform at site #2, that the residents or police were asked to cooperate or that AISG employees asked the Afghans to honor the prior license much less that attempts by AISG to perform at site #2 were rebutted by the Afghans. AISG's RFIs reflect this as well. The RFIs did not state that AISG could not build the DHQ on site #2. Rather, each RFI insisted that site #3 was more acceptable to the Afghans. The evidence supports a conclusion that the local Afghans may simply have favored the construction plan they were presented by AISG's Afghan subcontractor (R4, tabs 288, 343 at 44; tr. 1/280-82, 292). In any event, the RFIs did

11

not say, and AISG did not prove, that it could not access site #2. The Corps is not liable for additional costs AISG may have incurred waiting for the site it preferred.

Alternatively, AISG argues that the Corps admitted that changing to site #3 was necessary because construction on site #2 conflicted with the existing structure (app. br. at 2, 23-24; R4, tab 593 at 1-2). That argument is wrong for two reasons. First, the documents that reflect the Corps' adoption of site #3 do not support AISG's argument. There was no dispute that site #3 was better suited for construction (app. supp. R4, tab 48 at 2). As described by AISG employees, that site was more level without the substantial rock outcroppings present on site #2. The Corps had not opposed changing the work site from site #2 to site #3 based on its suitability for the project. The Corps' denial of RFIs 1 and 2 was based upon the government's limited authority to build the DHQ within the coordinates obtained in the license for construction from the Afghan MOI. Prior to the new certification obtained by the village residents, neither the Corps nor AISG had permission for construction on site #3. The Corps chose to rely upon that newly created agreement with the Afghan MOI. The Corps' adoption of site #3 based on the new Afghan license provided by AISG did not invalidate the prior license or undermine the reasonableness of the Corps' reliance on the earlier license.

Second, although the evidence is not clear on when or how the ANP prevented access to site #2, or whether they did as AISG acknowledges, the presence of the ANP post was an obvious obstruction to construction on that site. It was evident in the RFP, the contract documents and during AISG's pre-bid site inspection. It was equally obvious that the ANP could possibly refuse to move from its post on that site. AISG did not inquire with the CO whether the ANP post would affect the availability of site #2. To the contrary, AISG submitted a proposal for Modification No. 2 accepting all the terms and conditions of the RFP. AISG specifically demonstrated in that proposal that it could perform the contract on that site. AISG specifically addressed the obstacles present on site #2. And AISG signed Modification No. 2 with that knowledge. There was no ambiguity regarding the site or the representation made by the government. If there were such a patent ambiguity, AISG would have had a duty to inquire about it. Rather than ask the CO about those obstacles, AISG relied on its assumption, that the Corps would remove the ANP occupants. Having failed to make such an inquiry, AISG cannot now recover additional costs caused by that obstacle.

B. The ANP post was not a differing site condition.

AISG argues that continued occupation of the ANP checkpoint combined with the failure of the Corps to obtain permission from the village to tear down its wall constituted a differing site condition (app. br. at 32-34). It also argues, that by inclusion of site #2 in Modification No. 2 the Corps warranted access to that site (*id*. at 30). AISG is unable to support either argument. A differing site condition is a physical condition at the site that differs materially from the conditions indicated in the

contract or an unknown condition at the site of an unusual nature which differs materially from those ordinarily encountered in the type of work of the contract. *C.H. Hyperbarics, Inc.*, ASBCA No. 49375 *et al.*, 04-1 BCA ¶ 32,568 at 161,143-144 (citing *G&P Construction Company, Inc.*, ASBCA No. 49524, 98-1 BCA ¶ 29,457 at 146,226-227). AISG provided no evidence by testimony or documents that established when or how it was barred entry to site #2. Even assuming it was prevented from entering site #2, it cannot recover because it has not demonstrated that the presence of the ANP or the villagers constituted physical conditions that it could not anticipate from the terms of the contract, at the time of bidding. *Id.*

Moreover, the village wall did not interfere with AISG since it was agreed before Modification No. 2 that it would not take that wall down. AISG made an unwarranted assumption that the Corps would remove the ANP force. AISG's contentions thus fail for lack of proof. *Overstreet Electric Company, Inc.*, ASBCA No. 51654 *et al.*, 00-1 BCA ¶ 30,588 at 151,056-57; *Fred A. Arnold, Inc.*, ASBCA Nos. 20150, 22154, 84-3 BCA ¶ 17,624 at 87,848. Furthermore, having satisfied its obligation to provide access to site #2 when it obtained a valid license to that site, the government owed AISG no further duty.

Absent fault or negligence or an unqualified warranty on the part of its representatives, the Government is not liable for damages resulting from the action of third parties. *IAP Worldwide Services, Inc.*, ASBCA, No. 59397 *et al.*, 17-1 BCA ¶ 36,763 at 179,161 (*quoting Oman-Fischbach Int'l (JV) v. Pirie*, 276 F.3d 1380, 1385 (Fed. Cir. 2002) (citation omitted)). The government is not liable for acts of the ANP unless it assumed that risk in unmistakable terms. *IAP Worldwide* at 179,161. There is nothing in the contract which shifted the risk of increased costs caused by the ANP's occupation of the checkpoint on site #2 from AISG to the government.

C. The government did not cause AISG's delay.

AISG claims the government is responsible for the direct costs it incurred during the eight month delay between May and December 2012, while waiting for the modification to the contract site from site #2 to site #3 (app. br. at 31, 35). AISG's arguments are incorrect because the government did not cause contract delay during that period. First, as discussed above, the Corps was not obligated to issue a change to the construction site because AISG's proposal promised the contract was performable as written. AISG repeatedly confirmed that it could build the DHQ on site #2 (tr. 1/238, 284-87, 306, 4/309; R4, tabs 114, 417 at 2). Second, the government did not prevent AISG from performing contract work during that time. In fact, AISG could have begun the required preconstruction submittals in October 2011 (R4, tab 4). Accordingly, AISG was not constructively suspended by the government's refusal to modify the construction site. *P.R. Burke Corp. v. United States*, 277 F.3d 1346, 1359-61 (Fed. Cir. 2002). Finally, AISG recognized that it assumed the risk of the

costs it incurred resulting from the mobilization of its subcontractors prior to submission of the preconstruction submittals (tr. 2/281-82; R4, tab 44).

CONCLUSION

The appeal is denied. Appellant has not proven facts sufficient to establish entitlement to recover its costs.

Dated: March 30, 2020

DONALD E. KINNER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur                                                  I concur

RICHARD SHACKLEFORD                    J. REID PROUTY
Administrative Judge                          Administrative Judge
Acting Chairman                                Vice Chairman
Armed Services Board                         Armed Services Board
of Contract Appeals                           of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 58696, 59151, Appeals of AISG, Inc., rendered in conformance with the Board's Charter.

Dated: March 31, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

15